UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------x
MultiPlan, Inc.,

        Plaintiff

  - against -

Emergis, Inc. and BCE Emergis US
Holdings, Inc.,

        Defendants.
------------------------------------------------x

05 Civ. 4198 (TPG)

**OPINION**

  This is an action arising out of the sale of a privately held company. Plaintiff MultiPlan has brought this action against defendants Emergis, Inc. and BCE Emergis US Holdings, Inc. MultiPlan asserts one federal claim for Securities fraud under section 10(b) of the Securities Exchange Act of 1934, and seven state law claims including claims for fraud.

  Defendants have moved to dismiss plaintiff's federal securities law claim, the state law fraud claims, and a claim for breach of the undisclosed liability provision in the stock purchase agreement. This covers the Third, Fourth, Fifth, Sixth and Eighth Claims, and a portion of the First Claim. There is no motion to dismiss as to the Second and Seventh Claims, and part of the First Claim. The complaint contains a Fifth Claim for negligent misrepresentation, but that has been voluntarily dropped by plaintiff.

The court grants the motion to dismiss the federal securities law and common law fraud claims (Third, Fourth and Sixth), with leave to replead. The court denies the motion to dismiss as to the Eighth Claim. The pleading of the Eighth Claim is clearly sufficient, and no discussion in this opinion is required. However, an explanation with regard to the federal securities law and common law fraud claims is appropriate.

## The Claims

The following are the relevant allegations of the complaint, which are accepted as true for purposes of this motion.

Plaintiff MultiPlan is a New York corporation. It operates as a preferred provider health care network or PPO. PPOs offer healthcare payor clients access to a network of hospitals and health care providers at a pre-negotiated, discount rate. MultiPlan's network is nationwide.

Defendant Emergis, Inc. is a Canadian corporation headquartered in Quebec, Canada. Emergis, Inc. provides a service that performs electronic adjudication of health care claims and loans processing. Emergis, Inc. was the parent entity of defendant BCE Emergis US Holdings, Inc. US Health was a wholly-owned subsidiary of BCE Emergis US Holdings. The Emergis entities will be referred to as "Emergis."

In 2003, Emergis put US Health up for sale and sought bids for its purchase. Emergis engaged the investment banking firm CIBC World Markets to assist it in selling US Health. Using information provided by Emergis, CIBC prepared a Descriptive Memorandum. The Descriptive

Memorandum included certain unaudited financial information relating to the years 2000 through 2003.

In October 2003 plaintiff received the Descriptive Memorandum and expressed interest in acquiring US Health. The parties then began negotiating.

In November 2003 Emergis provided plaintiff further financial documentation. Plaintiff refers to the documents provided at this time as the November Financial Statements. They consisted of the audited financial statements for the year ending December 31, 2002 and the nine-months ending September 30, 2003, and an estimate of earnings for the full year 2003. The November Financial statements represented that 2002 EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization) was over $34 million, and estimated that 2003 EBITDA would be over $40 million. Along with the financial data for US Health, these figures covered an entity that plaintiff was not interested in purchasing, National Health Services, Inc.

During November and December 2003, plaintiff conducted what it refers to in the complaint as "due diligence." That process included review of the financial statements and of certain other materials, such as work papers of US Health's accounting firm, Deloitte & Touche. Plaintiff conducted interviews with officers of Emergis and certain of US Health's customers.

Following this process, plaintiff arrived at the price it would agree to pay for US Health. In doing so, plaintiff applied a multiplier of 5.4 to US Health's estimated 2003 EBITDA of $40 million which would total $216 million. The parties settled on a price of $213 Million. The agreement was signed on December 31, 2003 and the closing was scheduled for March 4, 2004.

US Health provided plaintiff with more financial documentation in February 2004, pursuant to the stock purchase agreement. Plaintiff refers to this documentation as the February Financial Statements. This was comprised of the same information as was contained in the November Financial Statements regarding the year 2002 and the nine months ending September 30, 2003 except that the February Financial Statements excluded the entity that plaintiff did not wish to purchase, National Health Services, Inc. Also, the February Financial Statements provided audited statements (rather than an estimation) for the full year 2003. Even with the exclusion of National Health Services, the February Financial Statements reiterated the figures for the 2002 and 2003 EBITDA that had been contained in the November Financial Statements. The transaction closed as scheduled on March 4, 2004. Plaintiff then performed a more detailed investigation of Emergis' books and records, some of which became available only after the closing. As a result of that investigation, plaintiff concluded that it had been misled as to the value of US Health and that it paid substantially more for US Health than it

would have paid had the finances of US Health been accurately presented. The court will summarize the allegations on this subject hereafter in this opinion.

## Discussion

The court has examined the allegations of the complaint on which the federal securities law claim and common law fraud claims are based, and has found them adequate on all the necessary elements except with respect to loss causation.

Emergis contends that a claim that plaintiff paid more than it should have for US Health cannot constitute a proper pleading of loss causation in the present case. There is arguably some support for this position in the case law. However, the court believes that plaintiff's claim of loss causation might well be allowable if it were presented in clear and definite terms. The standard for pleading loss causation may not entirely preclude the type of claim plaintiff seeks to make here, but at least it must be said that the standard is strict. In the view of the court, the present pleading does not meet that standard.

An important part of the claim of misrepresentation of the finances relates to alleged uncollectible accounts receivable. The complaint alleges that US Health had on its books such uncollectible accounts in the amounts of $3.8 million for 2003, $5.2 million for 2002, and $1.9 million for 2001 "for a total of $10.9 million as of the end of 2003" (par. 36). It is not explained why these year-end balances should be added

together to arrive at a "total of $10.9 million." However, that is the allegation. It is claimed that there was a $4.4 million reserve as of December 31, 2003 and that this was inadequate. It is further claimed that this improper recognition of accounts receivable resulted in revenues and earnings of US Health being overstated by at least $4 million to $5 million per year in 2002 and 2003 (par. 36).

The complaint goes on to allege that US Health had a practice of overbilling its clients so that it had no reasonable expectation of collecting all the receivables (par. 37). The complaint gives examples of such overbillings with respect to a client named Golden Rule Insurance. The allegation is that by the end of 2003 US Health's books reflected a balance for Golden Rule of $1,691,465, none of which was collectible (par. 38).

The complaint alleges that US Health applied this improper revenue recognition method to at least 20 clients. As a result US Health had on its books uncollectible accounts receivable in the amounts of $3.8 million for 2003, $5.2 million for 2002, and $1.9 million for 2001, for a total of $10.9 million as of the end of 2003, with an inadequate reserve of $4.4 million (par. 39). These are, of course, exactly the same figures presented a few paragraphs earlier in the complaint, as described above.

The complaint alleges that in 2002 US Health took an $8 million charge "to bad debt to clean up excess billings and a corresponding AR

balance," knowing that this charge did not really relate to bad debts but to improperly recognized revenues. Nevertheless, according to the complaint, US Health continued the improper practice even after its 2002 clean-up (par. 40).

It is alleged that the November and February Financial Statements showed "at least $6.5 million in AR ($10.9 million in AR - $4.4 million from reserves) and that this $6.5 million was improperly recorded as earnings (par. 41).

The complaint alleges that seven months after the closing of the US Health sale, Emergis "acknowledged a significant part of US Health's inappropriate revenue recognition practices and earnings overstatement," and agreed at that time that the working capital was overstated by $6.2 million due to uncollectible accounts receivable. Emergis agreed to pay plaintiff $6.2 million to make up for the discrepancy as to working capital (par. 42).

Oddly enough, the narrative in the complaint regarding the uncollectible accounts receivable and the improper revenue recognition ends with the allegation about the agreement by Emergis to pay plaintiff $6.2 million. But the accounts receivable problem and the problem about improper revenue recognition alleged in the above portion of the complaint (pars. 36-41) were clearly settled to the extent of at least $6.2 million. But how did far did the $6.2 million agreement go? For

instance, did it settle the entire $6.5 million claim referred to in paragraph 41? The complaint does not say.

Following the conclusion of the allegations just described, the complaint deals with three other matters under the headings "Earnings Management," "Under-Reporting of Expenses," and "Expense Reductions" (pars. 45-49). Under these headings there are reasonably specific claims of earnings inflation totaling $2.4 million and understatements of expenses totaling $1,500,000. The court will not engage in a detailed analysis of these items except to say that, as to the $500,000 reduction in sales commission liability and the $500,000 reduction in rent expenses, it is not clear why these items were fraudulent. However, for the purposes of this motion, the court will assume that all of these items involve misrepresentation.

The dollar total of the items reflected in these allegations is as follows. The figure of $6,500,000 comes from paragraph 41.

$$\begin{array}{r} \$\ 6{,}500{,}000 \\ 2{,}400{,}000 \\ 700{,}000 \\ \underline{900{,}000} \\ \$10{,}500{,}000 \end{array}$$

As to the damages resulting from the alleged misrepresentation of the finances of US Health, the complaint asserts:

> 58. At a minimum, MultiPlan suffered actual damages of the difference between the price it paid for US Health's shares and the actual value of the stock it received. Based on the overstatement of 2003 earnings and the price/earnings multiple on which the

> transaction price is based, MultiPlan overpaid
> for US Health's shares in excess of $50 million.

(Par. 58.) If the $10.5 million is multiplied by 5.4, the product is indeed more than $50 million. However, this does not take into account the $6.2 million adjustment. As indicated above, the complaint contains no explanation of how the $6.2 million is to be applied in the calculation of damages, or if it is not to be applied, why that is so. But it is surely possible that based on the allegations, as far as they go, the $10.5 million should be reduced by $6.2 million. If that is done the resulting amount is $4.3 million. If the multiplier of 5.4 is applied to that figure, the product is about $23 million.

What has been described is sufficient to indicate that the complaint, as it now stands, does not contain a clear and definite allegation of an amount by which plaintiff overpaid Emergis in the purchase of US Health. In other words, even if plaintiff's theory of loss causation is a valid one, the specifics are not sufficiently alleged in the complaint.

This means that the portions of the complaint claiming federal securities law violation and common law fraud must be dismissed for failure to adequately plead loss causation. If plaintiff wishes to attempt an adequate pleading in this regard, the complaint can be amended. In any such amended complaint, one thing that should be included (although the court is not attempting to give complete instructions) is an explanation of when the alleged misrepresentations referred to in

- 9 -

paragraphs 44-49 of the complaint were discovered in relation to the time when the $6.2 million agreement occurred.

## Conclusion

The federal securities law and common law fraud claims (Third, Fourth and Sixth) are dismissed with leave to replead. The claim for negligent misrepresentation (Fifth) has been voluntarily dropped by plaintiff.

The motion to dismiss the claim for breach of the undisclosed liability provision in the stock purchase agreement (Eighth) is denied.

SO ORDERED.

Dated:   New York, New York
         June 11, 2007

                                          _____
                                          THOMAS P. GRIESA
                                          U.S.D.J